NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO L.Z.

No. 1 CA-JV 23-0007
FILED 6-15-2023

Appeal from the Superior Court in Maricopa County
No. JD39669, JS21060
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Daniel J. Kiley joined.

**M O R S E**, Judge:

¶1        Brianna Z. ("Mother") appeals from the juvenile court's order terminating her parental rights.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        Mother and Shawn F. ("Father") are the biological parents of L.Z. ("Child"), born in December 2015.  The juvenile court did not terminate Father's parental rights, and he is not a party to this appeal.

### First Dependency

¶3        In July 2020, police responded to a welfare check near Mother's home after receiving reports that Mother ran down the street naked, struck a light pole with her head, and banged on her neighbor's door.  The first officer to arrive found Mother naked in the roadway outside her home.  Mother yelled at the officer as he tried to approach her and attacked another officer that tried to restrain her.  Eventually, officers tased Mother and transported her to the hospital.  Officers returned to Mother's home, found Child, bruised and completely naked, crying in a closet, and took Child to the hospital for evaluation.  The Department of Child Safety ("DCS") temporarily placed Child with her great aunt and uncle.

¶4        The following night, the police received a call from Mother's friend that Mother wanted to harm herself.  When officers arrived, Mother exhibited "pressured speech and extreme mood swings," and eventually bit her friend's stomach.  Officers transported Mother to a mental health treatment center.

¶5        The next day, DCS filed a dependency petition, which Mother contested.  The court set an adjudication hearing for November 2020.  At the hearing, Mother waived her right to contest the allegations.  The court adjudicated Child dependent and ordered Child to remain in out-of-home care but approved a case plan for reunification.  In January 2021, Mother moved to have Child returned to her physical custody.  The court granted Mother's motion in February 2021, but continued the dependency.  In June 2021, the court granted DCS's motion to dismiss the dependency.

### Second Dependency and Termination

¶6        On May 4, 2022, Mother called the police about a dead body in her home.  Mother and Child were sitting on the living-room couch when officers arrived.  Upon entering Mother's home, officers noticed and

followed a trail of blood to the master bedroom and found a dead, unidentified male lying face down on the bed.

¶7 Mother told police that she had been drunk and could not recall all the events of the previous evening but admitted spending time with her male cousin. Witnesses reported seeing the male cousin attempting to stop Mother from jumping off the roof into the pool and them fighting. Mother also told a friend she had "beat the sh**" out of her cousin and told police she had hit him with a hammer but claimed "he was still alive" when she checked on him early the next morning. Other witnesses reported seeing Child "running up and down the street calling for [Mother]" earlier in the day and saying things like "mommy killed him." The police arrested Mother and took Child to the hospital. At the police station, Child said that Mother stabbed her cousin.

¶8 DCS took custody of Child and placed Child with her great aunt and uncle. On May 9, 2022, DCS filed a dependency petition. The following day, Mother was released from jail. Shortly after Mother's release, DCS filed a petition to terminate Mother's parental rights under the recurrent-removal ground. Mother contested both petitions, and the court set the pretrial conference, dependency adjudication, and termination hearings for September 2022. The court also ordered DCS to refer Mother for a psychological evaluation. During the evaluation, Mother reported having depression and anxiety, and "that she had been drinking alcohol daily for ten days straight" after her mother passed away in April 2022. A week-and-a-half later, Mother moved for an emergency status conference for visitation with Child. The court declined Mother's request but instructed Mother to file another motion if no progress was made with visitation.

¶9 In June 2022, Mother was arrested for driving under the influence. A witness reported that Mother crossed the center lane and drove into oncoming traffic to get to her boyfriend on the sidewalk on the other side of the road. After Mother struck the curb, she got out of her car and tried to open other cars' doors on the roadway. Mother later admitted that she had been drinking before the incident. The following month, Mother filed another motion for an emergency status conference, requesting visitation with Child. The court granted Mother's motion and set a conference for July 2022. Following that conference, DCS moved to suspend Mother's visitation with Child, and the court granted DCS's motion, finding visitation between Mother and Child "would seriously endanger [Child's] present mental and emotional health."

**¶10** Mother failed to appear at the pretrial conference in September 2022, so the court reset the dependency adjudication and termination hearings for November 2022. In October 2022, Mother moved to continue the dependency adjudication and appoint a guardian ad litem due to her inpatient status at a behavioral health hospital. The court granted Mother's motions.

**¶11** At the hearing, Mother pled "no contest to the allegations in the dependency and termination petitions," and the court took the matter under advisement. In December 2022, the court adjudicated Child dependent and terminated Mother's parental rights. As to best interests, the court found DCS had proven, by a preponderance of the evidence, that Child "would be harmed by continuation of the parental relationship between [Mother] and [Child]." The court based its finding "on the evidence establishing that [Child] has gone through two traumatic dependencies involving [Mother], including the present dependency in which [Mother] killed a person in the home with [Child] and had [Child] remain in the home with the deceased person for hours." The court also noted that Mother "is unable to parent [Child] due to her mental health."

**¶12** Mother timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

**¶13** Parents have a fundamental right to the custody and control of their children, but that right is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248-49, ¶¶ 11-12 (2000). To terminate a parent's rights, a court must (1) find a statutory ground for termination under A.R.S. § 8-533 by clear and convincing evidence and (2) determine, by a preponderance of the evidence, that termination is in the child's best interests. *Id.* at 249, ¶ 12 (clear and convincing evidence); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 42 (2005) (preponderance of the evidence); *see* A.R.S. § 8-533(B) (requiring at least one statutory ground and a best-interests finding). Because the court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," we accept the court's findings of fact if reasonable evidence supports them and will affirm an order terminating parental rights unless it is clearly erroneous. *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004).

**¶14** Mother does not challenge the court's statutory grounds for termination. Mother only argues there is no valid factual basis to support the court's best-interests finding. We disagree.

**¶15** When determining whether termination is in the child's best interests, "courts must consider the totality of the circumstances existing at the time of the severance determination." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018). Moreover, a court's "primary concern" is the "child's interest in stability and security." *Id.* at 150, ¶ 12 (quoting *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 15 (2016)). Termination of the parent-child relationship is in the "child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Id.* at ¶ 13. A court may find a child would be harmed if termination is denied when the child experiences trauma under the parent's care, *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 176, 179, ¶¶ 3, 20 (App. 2014), and when there is evidence that a parent's unfitness "detrimentally affects the child's well-being" despite "the provision of services by [DCS]," *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989); *see Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 11 (App. 2016) (considering how the continued presence of a statutory ground may negatively affect a child).

**¶16** A parent who does not contest the termination of her parental rights is entitled only to a review of whether a factual basis supported termination. Ariz. R.P. Juv. Ct. 353(e)(3). Juvenile courts need not "list every fact upon which [their] findings are based" as it would impose an "undue burden and inappropriate task" on courts. *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 19 (App. 2007). We view "the record in the light most favorable to upholding the court's best-interests finding." *Alma S.*, 245 Ariz. at 152, ¶ 21. We do not reweigh factual or credibility determinations. *See Oscar O.*, 209 Ariz. at 336, ¶ 14 ("Our task for factual findings is solely to confirm that there is some reasonable evidence in the record to sustain them.").

**¶17** Here, the juvenile court found that Child would be harmed if termination was denied based on (1) Child's "two traumatic dependencies," (2) Mother allegedly "kill[ing] a person in the home" while Child was present, and (3) Mother's inability to parent Child "due to her mental health." The court separately noted its suspension of Mother's visitation with Child before the termination hearing, finding "contact between [Mother] and [Child] would seriously endanger [Child's] physical, mental, moral or emotional health." The record supports these findings.

**¶18** After the May incident, Child reported having nightmares, and Child's great aunt reported Child making comments like "Momma killed him" or "Momma murdered him" during the day and constantly needing to reassure Child. The record shows Child began participating in individual therapy and presented with behavioral dysregulation and other significant symptoms of trauma, resulting in a diagnosis of post-traumatic stress disorder. The court also heard evidence that Child would disengage whenever the DCS case manager mentioned Mother's name. The case manager opined that if Child remained connected to Mother, Child would be negatively impacted or prevented from having "the stability she needs to go to therapy" and move past her trauma. The case manager concluded that because Mother's actions had increased in severity since the first dependency, Child would be harmed if DCS placed Child with Mother.

**¶19** As to Mother's mental health, the record shows that Mother engaged in erratic behavior leading to arrest, abused substances, and was admitted to a mental health facility during the pendency of the termination action. Mother's evaluating psychologist gave Mother an "extremely poor" prognosis regarding her ability to parent Child based on Mother's "poorly managed mental health and substance use," which would place Child at risk of harm or neglect. Because reasonable evidence in the record shows Child would be harmed if the parent-child relationship continued, a factual basis exists to support the termination of Mother's parental rights. *See* Ariz. R.P. Juv. Ct. 353(e)(3); *Tina T. v. Dep't of Child Safety*, 236 Ariz. 295, 299, ¶ 16 (App. 2014) (stating that we review whether "the juvenile court record includes evidence that, if believed, would establish the statutory grounds for termination of Mother's parental rights"), *abrogated on other grounds by Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224 (2020).

**¶20** Mother also argues that the court could have considered a guardianship that restricted Mother's access to the Child until Father could take custody of Child. The record supports the court's finding that Child "would be harmed by continuation of the parental relationship" with Mother. *See Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 478, ¶ 31 (2022) (noting that courts should consider whether a child's interests "are served by termination or maintenance of the parent-child relationship"). The court found the opportunity for stability, safety, and permanency provided by termination was in Child's best interests. *See Alma S.*, 245 Ariz. at 150, ¶ 12 (emphasizing "stability and security" are a court's "primary concern"). We find no error in how the court weighed the evidence. *See Oscar O.*, 209 Ariz. at 334, ¶ 4 (noting juvenile courts are "in the best position to weigh the evidence").

**CONCLUSION**

¶21 We affirm the juvenile court's order terminating Mother's parental rights.



AMY M. WOOD • Clerk of the Court
FILED: AA